Damaris Mangual Vélez, Comisionada Electoral del Partido Independentista Puertorriqueño, recurrente y apelante, *v.* Comisión Estatal de Elecciones, recurrida y apelada.

*Número:* AP-95-13 *Resuelto:* 21 de septiembre de 1995

*Carlos I. Gorrín Peralta*, abogado de la apelante; *David Rivé Rivera*, abogado de la Comisión Estatal de Elecciones, apelado; *Lino J. Saldaña*, abogado del Partido Demócrata de Puerto Rico, recurrido; *Carlos Canals Mora*, Comisionado Especial del Partido Nuevo Progresista, interventor.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

El Partido Independentista Puertorriqueño acude ante nos para solicitar la revocación de una sentencia del Tribunal de Primera Instancia, Sala Superior de San Juan (Hon. Ángel Hermida, Juez), la cual sostuvo la determinación del Presidente de la Comisión Estatal de Elecciones de vender listas electorales y prestar, sujeto a una fianza, ciertos materiales electorales al Partido Demócrata de Puerto Rico. Resolvemos que la venta de las listas para fines de la reorganización de partidos afiliados a partidos políticos de Estados Unidos, no está prohibida por la Ley Electoral de Puerto Rico. Además, su entrega, en unión al préstamo de materiales, no constituye una utilización de fondos públicos según vedada por la Ley de Primarias Presidenciales Compulsorias. Por ende, confirmamos la sentencia recurrida.

I

En conformidad con la ley —Ley Núm. 91 de 28 de julio de 1995 (16 L.P.R.A. sec. 1353)— el Partido Demócrata de Puerto Rico tiene pautadas para el 24 de septiembre de 1995 sus elecciones internas. Mediante este proceso, este partido reorganizará su Comité Central con miras a la celebración de unas primarias presidenciales el próximo año.

Como parte de los preparativos, el 22 de agosto de 1995 el Lcdo. René Muñoz Padín, en su carácter de Presidente de la Comisión que dirige el proceso de elecciones internas, solicitó al Hon. Juan R. Melecio, Presidente de la Comisión Estatal de Elecciones (en adelante C.E.E.), que le facilitara al Partido Demócrata,([1]) en calidad de préstamo, la lista de electores capacitados para votar y los materiales necesarios para los colegios de votación, los cuales incluían tinta indeleble, lámparas, casetas de votación y urnas. La solicitud se fundamentó en lo dispuesto por el Art. 1.011(A)(m) de la Ley Núm. 4 de 20 de diciembre de 1977, según enmendada, conocida como Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3007(A)(m), y en las disposiciones de la Ley de Primarias Presidenciales Compulsorias.

Mediante Resolución de 24 de agosto de 1995, el Presidente de la C.E.E. denegó la solicitud. Tomó dicha determinación al amparo de lo dispuesto en la Ley Núm. 91, *supra*, y de lo resuelto por este Tribunal en *P.S.P. v. E.L.A.*, 107 D.P.R. 590 (1978). Según la resolución, este caso estableció la doctrina reafirmada luego en *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988), de que no es permitido el uso de fondos públicos para la reorganización interna de los partidos afiliados a los partidos políticos nacionales. La Ley Núm. 91, *supra*, por su parte, prohíbe de forma expresa la utilización de fondos públicos en los procesos de reorganización interna de estos partidos. Concluyó finalmente el Presidente que la

---

([1]) Dicha agrupación es un partido político afiliado según define el Art. 2(n) de la Ley de Primarias Presidenciales Compulsorias, 16 L.P.R.A. sec. 1322(n).

colaboración solicitada, "independientemente de la forma que se plantee, conlleva el uso de fondos públicos, lo que la hace contraria a lo establecido por la jurisprudencia y ... a lo dispuesto en la Ley Núm. 91".[2]

Pese a lo anterior, días más tarde, el 30 de agosto, el Presidente de la C.E.E. celebró una reunión con los representantes del Partido Demócrata, en la cual éstos expresaron su interés en comprar las listas y otros materiales electorales. El Presidente denegó proveer gratuitamente, una vez más, lo siguiente: las urnas y las casetas, el espacio para almacenar y ensamblar los materiales electorales, la red de telecomunicaciones y el espacio para recibir los resultados. Sin embargo, en atención a las nuevas circunstancias, el Presidente acordó:

> Venderle dos copias de la lista electoral por $5000. La lista se prepararía al cierre del Registro Electoral del 22 de julio de 1995.
> Venderle 2100 potes de tinta indeleble de la usada en eventos anteriores por $2000.
> Sujeto a una garantía de $3000 a depositarse mediante cheque o fianza, prestarle 2100 lámparas de aquellas que todavía están en inventario, pero no se usan en los eventos electorales administrados por la CEE. La Comisión de Primarias del Partido Demócrata tendría que comprar e instalar las baterías a las lámparas. No obstante, que dichas lámparas tienen al presente un valor residual, en caso de pérdida o daño, la Comisión las repondrá a razón de $10 cada una. Apéndice del Escrito de Apelación, pág. 19.

Según consta en la minuta de dicha reunión, el funcionario aclaró que "si bien está en disposición de ofrecer su colaboración a la Comisión de Primarias en todo aquello que la ley permita, no tiene jurisdicción en este proceso de reorganización". Apéndice del Escrito de Apelación, pág. 19.

---

[2] Resolución del Presidente de la Comisión Estatal de Elecciones (en adelante C.E.E.) de 24 de agosto de 1995, Apéndice del Escrito de Apelación, pág. 17.

De los autos del caso no surge que las determinaciones antes descritas del Presidente de la C.E.E. fueran informadas ni discutidas con los Comisionados Electorales de los principales partidos locales: el Partido Independentista Puertorriqueño (en adelante P.I.P.), el Partido Nuevo Progresista (en adelante P.N.P.) y el Partido Popular Democrático (en adelante P.P.D.). Al enterarse —mediante la prensa— la Lcda. Damaris B. Mangual Vélez, Comisionada Electoral del P.I.P., de la decisión del Presidente, el 31 de agosto de 1995 le cursó una carta al Hon. Juan R. Melecio en la cual solicitó que se detuviera el proceso de entrega de las listas electorales, pues tenía serias dudas legales y constitucionales sobre este proceder. A estos efectos solicitó una reunión.

Con el propósito de atender estos planteamientos, el Presidente de la C.E.E. citó a una reunión extraordinaria el 1ro de septiembre de 1995, la cual, por diversas razones, hubo que posponer hasta el 8 de septiembre. En la reunión no fue posible alcanzar unanimidad de criterio entre los tres (3) Comisionados Electorales, por lo cual —y tal como faculta la ley— el Presidente emitió la decisión de la C.E.E.(³) Dicha determinación, reducida a escrito el 11 de septiembre, reafirmó el criterio anterior del Presidente de vender unos materiales y prestar otros sujeto al depósito de una fianza. En consecuencia, ordenó la impresión y entrega de dos (2) copias de la lista, además de la tinta y las lámparas, al Partido Demócrata.

De esta resolución, acudió el P.I.P. en recurso de revisión al Tribunal de Primera Instancia, Sala Superior de San Juan, el 12 de septiembre de 1995. Con el objetivo de que el recurso no se tornara académico, presentaron también una solicitud de paralización de la entrega de los materiales

---

(³) Aunque los Comisionados Electorales del Partido Nuevo Progresista (en adelante P.N.P) y del Partido Popular Democrático (en adelante P.P.D.) coincidieron con el Presidente, la Comisión Estatal de Elecciones (en adelante C.E.E.) toma sus determinaciones por unanimidad. Ausente ésta, el Presidente decide la cuestión. Art. 1.031 (16 L.P.R.A. sec. 3031).

electorales por parte de la C.E.E. Actuando con la celeridad que ameritaba el asunto, el tribunal de instancia citó a las partes a una vista a celebrarse el día siguiente, 13 de septiembre.[4]

En la vista se permitió, sin objeción de las partes, la participación como interventores de los Comisionados Electorales del P.N.P. y P.P.D., además de los dos (2) candidatos a la presidencia del Partido Demócrata de Puerto Rico.[5] Cada parte tuvo la oportunidad de presentar sus argumentos, tras lo cual la controversia quedó sometida. Tal como anunció al concluir la vista, el tribunal resolvió al día siguiente. Mediante una sentencia se denegó la revisión y se dejó en libertad al Presidente de la C.E.E. para entregar los materiales.

El P.I.P. acude ante este Tribunal mediante un recurso de apelación y solicita que revoquemos al tribunal de instancia y ordenemos al Presidente de la C.E.E. que se abstenga de entregar los materiales que la sentencia permitió.

Por la naturaleza de la controversia, concedimos a todas las partes un corto término para expresarse en cuanto al recurso del P.I.P.[6] Éstas han comparecido. Con el beneficio de todas las posiciones, se acepta la apelación presentada y, al amparo de la Regla 54 del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI, se confirma el dictamen recurrido sin ulteriores procedimientos.

---

[4] Nada dispuso en torno a la paralización de la entrega, pues la representación legal de la C.E.E. informó que ésta no se llevaría a cabo antes de celebrarse la vista. Sin embargo, al celebrarse la vista y, en corte abierta, el tribunal ordenó a la C.E.E. que se abstuviera de entregar los materiales antes de que la sentencia fuera notificada.

[5] Éstos son Carlos Romero Barceló y Celeste Benítez.

[6] El recurso fue presentado ante este Tribunal el viernes 15 de septiembre de 1995. El mismo día concedimos a las partes hasta el martes 19 de septiembre de 1995 para exponer sus respectivas posiciones.

## II

En sustancia, son dos (2) los planteamientos del P.I.P. El primero es el concerniente a la venta de las listas, actuación que reclaman que está vedada por la Ley Electoral de Puerto Rico y por el ordenamiento constitucional. En segundo lugar, alegan que la decisión del Presidente de la C.E.E., que autorizó la venta y el préstamo de materiales, constituye una utilización de fondos públicos en un proceso de reorganización interna de un partido nacional de Estados Unidos. Aunque el primer planteamiento se limita a la entrega de las listas, su discusión debe preceder, pues una adjudicación favorable a los apelantes haría innecesario dilucidar la controversia de las listas a nivel constitucional.

A. La posición del P.I.P. descansa primordialmente en dos (2) artículos de la Ley Electoral de Puerto Rico. Los Arts. 1.011(A)(n) y 1.016 (16 L.P.R.A. secs. 3007(A)(n) y 3016) disponen respectivamente, en lo pertinente:

*Sec. 3007. Facultades y deberes del Presidente y los Vicepresidentes*

(n) A excepción del Registro Electoral, tarjetas de identificación electoral, papeletas electorales y hojas de cotejo a usarse en una elección, el Presidente podrá vender a cualquier persona, entidad, organización o grupo, sujeto a las disposiciones de este Subtítulo, los impresos que prepare o mande a imprimir la Comisión. La Comisión fijará por reglamento el precio de venta de tales materiales y la cantidad que por tal concepto se obtuviere, engrosará a los fondos operacionales de la Comisión.

*Sec. 3016. Documentos de la Comisión*

Salvo que otra cosa se disponga en este Subtítulo, todos los récords, escritos, documentos, archivos y materiales de la Comisión serán considerados como documentos públicos y podrán ser examinados por cualquier Comisionado o persona interesada. No obstante lo dispuesto, y salvo lo que más adelante se dispone para las papeletas de muestra o modelo, la Comisión no suministrará o proveerá a persona alguna copias del Registro Electoral o de las tarjetas de identificación electoral, papeletas, actas de escrutinio o las hojas de cotejo oficiales

que hayan de utilizarse en una elección. Las peticiones de inscripción serán consideradas documento privado y solamente podrán solicitar copias de las mismas el inscrito o su representante, los Comisionados Electorales, la Comisión Estatal de Elecciones y sus organismos oficiales o cualquier Tribunal de Justicia que en el desempeño de sus funciones a tenor con las disposiciones de este Subtítulo lo requiera.

Los Comisionados Electorales tendrán derecho a solicitar copia de los documentos de la Comisión y éstos se expedirán libre de costo y dentro de los diez (10) días siguientes a la solicitud.

En su sentencia y tras examinar la Ley Electoral de Puerto Rico, el ilustrado Tribunal de Primera Instancia distinguió entre las listas electorales que el Presidente de la C.E.E. determinó vender y el Registro Electoral, cuya venta se prohíbe por la ley. Su criterio estuvo basado en las definiciones y disposiciones del ordenamiento electoral. Aunque es cierto que la Ley Electoral de Puerto Rico utiliza variados términos para referirse a las listas que la C.E.E. está llamada a confeccionar, un examen del contenido y descripción que se da a cada uno hace claro que no se trata de una simple y única lista de nombres.

El Art. 1.003 contiene la siguiente definición en su inciso (52), 16 L.P.R.A. sec. 3003(52):

(52) "Registro General de Electores" significará el récord preparado por la Comisión Estatal de Elecciones del total de electores que se han inscrito en el Estado Libre Asociado de Puerto Rico para fines electorales. Dicho récord consiste de las peticiones de inscripción, tarjetas de identificación electoral y de la grabación mecánica o electrónica, micrografía, microfichas u otra forma de compilación de los datos contenidos en dichas peticiones.

El Art. 2.012 (16 L.P.R.A. sec. 3062), por su parte, ordena a la C.E.E. la preparación de un "Registro del Cuerpo Electoral de Puerto Rico". Dispone el artículo:

*Sec. 3062. Registro del Cuerpo Electoral*
La Comisión organizará un Registro del Cuerpo Electoral de Puerto Rico contentivo de todas las inscripciones de los

electores. Dicho Registro deberá mantenerse en forma tal que pueda determinarse, veraz y prontamente, la información relacionada con las peticiones de inscripción consignadas en el mismo, así como toda otra información relacionada necesaria para la implementación de este Subtítulo.

Los datos contenidos en el Registro se mantendrán, en todo momento, actualizados en cuanto a circunstancias modificatorias de cualquier inscripción.

Todas las listas de electores con derecho a votar en una elección se prepararán tomando como base tal Registro.

Si un elector dejare de votar en una elección general su nombre será excluido de las listas electorales.

Disponiéndose que, la Comisión mantendrá aparte, en un lugar seguro y bajo su custodia no menos de una (1) reproducción fiel y exacta del Registro del Cuerpo Electoral, debiendo realizar continuamente las modificaciones que fueren necesarias para actualizar el mismo.

 Sin lugar a dudas el "Registro General de Electores" y el "Registro del Cuerpo Electoral de Puerto Rico" son esencialmente la misma cosa. Este Registro Electoral, como en adelante lo denominamos, se trata de un registro o expediente primario contentivo de toda la información relacionada con la inscripción de un elector en Puerto Rico. Tiene el carácter de un expediente e incluye las peticiones de inscripción, las llamadas tarjetas electorales, además de otras formas de compilación de los datos contenidos en las peticiones. Las peticiones de inscripción, a su vez, contienen la siguiente información personal del peticionario: (a) su nombre y apellidos, paterno y materno; (b) nombre del padre y de la madre; (c) sexo, color de ojos y estatura; (d) lugar de nacimiento, que indique el municipio; (e) fecha de nacimiento; (f) si es ciudadano de Estados Unidos; (g) estado civil y, de ser casado, el nombre y los apellidos legales de su cónyuge; (h) domicilio; (i) dirección postal; (j) su firma o marca, o la de la persona que lo haga a su ruego, si éste no sabe firmar o no puede hacerlo; (k) copia del acta de

nacimiento. Art. 2.007 (16 L.P.R.A. sec. 3057). Resulta obvio el interés público del legislador al querer proteger esta información personal de cada elector prohibiendo la venta del Registro Electoral.

◼ De otro lado, nos parece razonable que la C.E.E., al mismo tiempo que como custodio posee un expediente de toda la información personal relacionada con cada elector, tenga disponible además un listado más sencillo con el propósito de ser utilizado en la mecánica de los procesos electorales. La distinción es clara en el Art. 2.012, *supra,* en cuanto dispone que: "Todas las listas de electores con derecho a votar en una elección se prepararán tomando como base [el Registro Electoral]."([7]) El contenido limitado de estas listas se presenta en varias disposiciones de la Ley Electoral de Puerto Rico, tal como el Art. 2.013 (16 L.P.R.A. sec. 3063), el cual habla en términos de un "registro general de electores inscritos" (distinto al Registro Electoral discutido previamente), que "contendrá los nombres, apellidos y número de tarjeta de identificación de todas las personas inscritas, así como el precinto y unidad electoral al cual pertenece cada una de ellas". Este registro de electores es, a su vez, similar a lo que la ley define como "Lista Final" en su Art. 1.003(21), 16 L.P.R.A. sec. 3003(21), el cual dispone un listado de los electores inscritos en determinada unidad electoral. En ambos casos, se trata de listas de electores que contienen una información relacionada al nombre, el número de tarjeta electoral, el precinto y la unidad del elector. Las listas no sirven para identificar la afiliación política de los electores.

◼ Aunque estas listas contengan información como la dirección del elector, esto no significa que su entrega infringe el derecho a la intimidad de los electores.([8]) Vistos

---

([7]) Véase, además, el Art. 7.004 (16 L.P.R.A. sec. 3304).

([8]) Valga apuntar que, en sus señalamientos de errores, el P.I.P. no alegó ante nos que la entrega de las listas constituía una violación del derecho constitucional a

en conjunto los Art. 1.011(A)(n) y 1.016, *supra*, la Ley Electoral de Puerto Rico considera sus documentos como públicos, con excepción de aquellos relacionados con el historial personal de cada elector (Registro Electoral y tarjetas de identificación) o los que atañen a la seguridad y secretividad del proceso electoral (papeletas, actas de escrutinio y las hojas de cotejos oficiales). En el caso del Registro, éste no puede ser público, pues contiene las peticiones de inscripción de los electores, las cuales la ley considera expresamente un documento privado.

▪ Además, son varias las instancias en que la Ley Electoral de Puerto Rico dispone la difusión pública de las listas de votantes en el contexto del proceso electoral. Tal es el caso cuando se excluyen personas del Registro Electoral[9] o cuando se brinda la oportunidad a cualquier persona de poder recusar a un elector.[10] Respecto a la se-

---

la intimidad de los electores y, menos aún, que tuviese una acción legitimada para reclamar en nombre de terceros.

[9] Art. 2.015 (16 L.P.R.A. sec. 3065):

"Cada seis (6) meses la Comisión deberá publicar listas contentivas de las inclusiones, exclusiones, transferencias y reubicaciones de carácter firme que se operen en el Registro. En dichas listas deberá consignarse el nombre, dirección y número electoral de cada persona comprendida en la misma. En adición, la lista de exclusiones especificará la razón que motivó cada una de ellas. *Estas listas se exhibirán al público en el lugar que la Comisión determine por reglamento* y se entregará, además copia de las mismas a los Comisionados Electorales y a los organismos directivos centrales de los partidos políticos." (Énfasis suplido.)

[10] Art. 2.019 (16 L.P.R.A. sec. 3069):

"Dentro de los sesenta (60) días siguientes a la fecha en que cada precinto haya finalizado oficialmente los procesos y trabajos de la inscripción general, la Comisión remitirá, con acuse de recibo a los organismos directivos centrales de cada partido político, dos (2) listas completas de todos los electores que hubieran presentado en dicho precinto sus correspondientes peticiones de inscripción, indicando su nombre, edad, dirección, nombre de sus padres y cualquier otra información que la Comisión estimare pertinente.

"Los partidos políticos podrán radicar ante la Comisión Local cualquier acción de recusación de peticiones de inscripción que estimaren procedente, en cualquier momento y hasta los treinta (30) días siguientes a la fecha de recibo de las listas aquí indicadas.

"Dentro del término dispuesto para el envío de las listas de referencia a los partidos políticos, se remitirán copias de éstas a las Comisiones Locales para que éstas, de inmediato, *las expongan a la vista pública en su lugar habitual de reunión.*

gunda situación, nuestro esquema electoral no atribuye de forma exclusiva a los partidos políticos de Puerto Rico la potestad de recusar, sino que permite a personas particulares hacerlo. Resulta evidente que el ejercicio efectivo de esta prerrogativa está condicionado a que la C.E.E. haga pública las listas.

Las listas que el Presidente de la C.E.E. autorizó vender al Partido Demócrata son similares a las que el Art. 5.013 (16 L.P.R.A. sec. 3212a) ordena a la C.E.E. entregar a cada partido político local con sesenta (60) días de anticipación a las elecciones generales y que son ampliamente distribuidas en los procesos electorales. No se trata, como alega la parte apelante, de la venta del Registro Electoral con el historial personal de cada elector, que está vedada por la Ley Electoral de Puerto Rico. Por lo tanto, fue correcta la determinación del tribunal de instancia al desestimar el planteamiento de ilegalidad de la venta.

Resta examinar si la venta de dichas listas, en unión al préstamo de materiales electorales acordado con el Partido Demócrata, constituye una "utilización de fondos públicos" que vulnere, por lo tanto, la prohibición de la Ley Núm. 91, *supra.*

B. En ocasiones previas hemos tenido la oportunidad de examinar la legislación que regula la celebración de primarias presidenciales por parte de partidos afiliados a los partidos políticos de Estados Unidos y su relación con el Art. VI, Sec. 9 de nuestra Constitución, en el cual se provee: "Sólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley." Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 369.

■ Mediante la Ley Núm. 102 de 24 de junio de 1977

---

"Cualquier persona del precinto que reúna las condiciones para ser elector podrá recusar la petición de inscripción de una persona que aparezca en dichas listas." (Énfasis suplido.)

(16 L.P.R.A. sec. 1301 *et seq.*) la Asamblea Legislativa adoptó la primera Ley de Primarias Presidenciales Compulsorias. En *P.S.P. v. E.L.A.*, supra, pasamos juicio sobre la constitucionalidad de una asignación de fondos hecha al amparo del estatuto. Mediante una interpretación particular de nuestra función adjudicativa en lo que corresponde al concepto "fines públicos" de la citada Sec. 9, decidimos que era inconstitucional el uso de fondos y de propiedades públicas para las elecciones internas de un grupo de ciudadanos afiliados a un partido de Estados Unidos. Sostuvimos que la "entidad favorecida con la asignación de fondos en este caso no es un partido político puertorriqueño ni sirve o complementa, dentro de los criterios discutidos, un fin gubernamental". Íd., pág. 611. En la opinión se expresó, además, que dicha asignación de fondos *por parte de la Asamblea Legislativa* está relacionada directamente con la decisión sobre el destino político final de Puerto Rico; esta actuación infringe la Sec. 19 del Art. II de la Constitución, L.P.R.A., Tomo 1, en la cual, sobre tales asuntos, se hizo una clara reserva de poder a *El Pueblo.*

Como resultado de esta decisión, la Legislatura aprobó una nueva ley, la Ley Núm. 6 de 24 de septiembre de 1979 (16 L.P.R.A. sec. 1321 *et seq.*), la cual ha sido subsiguientemente enmendada. Dicho estatuto introdujo cambios sustanciales en el ordenamiento de las primarias presidenciales y, en particular, se incluyó una expresión sobre la intención legislativa en la cual se negaba que la celebración de las primarias presidenciales pudiese interpretarse para propósito alguno indicador de cuál es la preferencia del pueblo en cuanto al *status* político.

En *P.I.P. v. E.L.A.*, 109 D.P.R. 403 (1980), se trajo ante la consideración del Tribunal la nueva ley de 1979. El tribunal de instancia había declarado inconstitucional la asignación de fondos públicos para las primarias presidenciales de 1980. Al considerar la controversia, este Tribunal se dividió de tal manera que no hubo mayoría para declarar

la inconstitucionalidad de la medida. Art. V, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1. En consecuencia, la sentencia de instancia quedó revocada y la asignación de fondos recuperó su carácter constitucional.

■ No es hasta *P.I.P. v. C.E.E.*, supra, que volvimos a expresarnos mediante una opinión mayoritaria. Allí tomamos conocimiento de los cambios realizados en la ley de 1979 y reexaminamos la interpretación del alcance del poder de adjudicación del Tribunal en cuanto al concepto "fines públicos" realizada en *P.S.P. v. E.L.A.*, supra, pág. 598. Decidimos que al interpretar la citada Sec. 9 nuestras facultades no son " 'más amplias que las simplemente derivables de nuestro sistema de separación de poderes' ". *P.I.P. v. C.E.E.*, supra, pág. 610. Aunque la determinación inicial que tomen el Poder Legislativo y el Poder Ejecutivo sobre lo que es un fin público es revisable por los tribunales, "en el desempeño normal de nuestras funciones revisoras bajo el sistema de separación de poderes ... debemos actuar con prudencia y deferencia a la voluntad legislativa, siempre que la misma esté enmarcada dentro del esquema constitucional y aunque como magistrados discrepemos personalmente de la bondad de los actos legislativos". Íd., pág. 611. En ese contexto y en cuanto a dicho asunto, concluimos que al considerar la reglamentación del proceso de sufragio para las primarias presidenciales, un fin público, "la Legislatura hizo una determinación válida al amparo de sus poderes constitucionales". Íd., pág. 619.

El caso de epígrafe se da a la luz de la Ley de Primarias Presidenciales Compulsorias aprobada en 1979 y sostenida como constitucional en 1988. La particularidad de la controversia descansa en que no está bajo discusión el proceso mismo de primarias presidenciales, sino la reorganización o las elecciones internas de los partidos afiliados. Hasta muy recientemente, la Asamblea Legislativa no había tocado lo referente a los procesos electorales de reorganización interna de los partidos políticos nacionales de Estados

Unidos. Con la aprobación de la Ley Núm. 91, *supra*, la cual enmienda el Art. 34 de la Ley de Primarias Presidenciales Compulsorias, 16 L.P.R.A. sec. 1353, se intentó dar forma a este proceso.

A partir de la adopción de dicha ley, todo partido nacional de Estados Unidos o partido político afiliado "deberá celebrar primarias de reorganización interna con la más amplia oportunidad de participación electoral". 16 L.P.R.A. sec. 1353. A tales efectos, la ley dispone la celebración de estas elecciones internas dentro de un período restringido de tiempo.[11] Esta medida legislativa no constituye, sin embargo, un esfuerzo aislado. Se hace muy claro en la Exposición de Motivos —1995 Leyes de Puerto Rico 416— y en el texto de la ley que el proceso primarista de reorganización interna se exige en función de la posterior celebración de las primarias presidenciales. De este modo, el legislador quizo democratizar y garantizar la más amplia participación posible en los procesos de reorganización interna "como requisito previo" para que estos partidos puedan acogerse al uso de fondos públicos en las Primarias Presidenciales.

El P.I.P. alega que la venta y el préstamo de materiales electorales para el proceso de reorganización interna del Partido Demócrata vulnera la doctrina establecida en la jurisprudencia antes reseñada, en cuanto es una actuación contraria al mandato constitucional de la Sec. 9, Art. VI, Const. E.L.A., *supra*. *No es necesario, sin embargo, entrar a discutir dicho planteamiento.* La propia Ley Núm. 91, *supra*, atiende el asunto y dispone que en el proceso de reorganización interna "no se utilizará fondos públicos". Procede interpretar la disposición estatutaria.

En primer lugar, contrario a lo que alega el P.I.P, la

---

[11] El proceso deberá realizarse no antes de veinticuatro (24) meses, previo a la fecha de las primarias presidenciales, y no más tarde del 31 de octubre del año que antecede al año cuando se celebre la nominación de candidatos a la presidencia y vicepresidencia de Estados Unidos.

Ley Num. 91, *supra*, no prohíbe la venta de las listas electorales ni de los potes de tinta, ni el préstamo de las lámparas. Esta disposición sólo dispone que, en el proceso de reorganización interna, "no se utilizará fondos públicos". Esto significa que en estos procesos la C.E.E. no puede proveer en forma gratuita a los partidos nacionales fondos o materiales públicos para llevar a cabo la reorganización interna.

Por otro lado, una lectura de la extensa Exposición de Motivos de la Ley Núm. 91, *supra*, y del debate legislativo del proyecto que posteriormente se convirtió en ley, nos ha convencido, al igual que al tribunal de instancia, de que al aprobar la anterior disposición la intención legislativa no fue impedir que se vendan al costo a los partidos afiliados las listas electorales ni los potes de tinta, ni que se presten las lámparas.

Además, adviértase que no se alega la existencia de una asignación de fondos para los partidos en proceso de reorganización ni una asignación particular a la C.E.E. para atender estos procesos. El argumento es que las gestiones propias de preparar las listas para la venta y su entrega, junto a los demás materiales, consume un esfuerzo y tiempo traducible en una pérdida de fondos públicos. Tal interpretación de la prohibición contenida en la legislación obvia el interés que también tiene la Asamblea Legislativa en que estos procesos de reorganización se celebren de manera ordenada. En particular, la prohibición no priva a los partidos del beneficio que legítimamente puedan derivar de la experiencia y del conocimiento que —en procesos electorales— tenga el Presidente de la C.E.E. De hecho, la propia Ley Electoral de Puerto Rico le impone como deber al Presidente colaborar en lo posible en estos procesos.

### Sec. 3007. *Facultades y deberes del Presidente y los Vicepresidentes*

A— El Presidente será el oficial ejecutivo de la Comisión y será responsable por llevar a cabo y supervisar los procesos electorales dentro de un ambiente de absoluta pureza e imparcialidad. En el desempeño de tal encomienda tendrá los poderes, atribuciones y prerrogativas inherentes al cargo, incluyendo sin que se entienda como una limitación, las siguientes:

. . . . . . . .

(m) Dirigir, supervisar y efectuar, a petición de un partido político afiliado, principal o agrupación de ciudadanos reconocida por un partido nacional, cualquier procedimiento de elección interna con arreglo a las determinaciones y reglas establecidas para tal procedimiento en los reglamentos del peticionario, siempre que tales determinaciones y reglas garanticen la plena participación de los afiliados del peticionario y la pureza de los procedimientos que inspiran este Subtítulo. Ningún [organismo] político de los aquí descritos podrá acogerse al beneficio de esta disposición más de una vez cada cuatrienio. Art. 1.011(A)(m), *supra.*

Es en este contexto que el Partido Demócrata solicitó al Presidente, y no a la C.E.E., la venta y el préstamo garantizado de determinados materiales electorales. Es preciso señalar que el Presidente no accedió a todo lo solicitado y que, en lo que sí accedió, lo hizo de forma condicionada. Por un lado, el precio de venta de las listas y los potes de tinta fue acordado de manera que se pagaran los costos incurridos por la C.E.E. Esto no ha sido cuestionado por el P.I.P.([12]) En el caso de las lámparas, su préstamo se realizó sujeto al depósito de una fianza, por lo que se garantizó que en caso de pérdida o daños los fondos públicos tampoco se verían afectados.

El Presidente de la C.E.E. ejerció su discreción al interpretar el alcance de su obligación de colaborar a la luz del Art. 1.011(A)(m) de la Ley Electoral de Puerto Rico, *supra.* Además, los materiales electorales en cuestión son útiles para la realización del proceso de elecciones internas

---

([12]) Véase Sentencia, Apéndice del Escrito de Apelación, pág. 98.

del Partido Demócrata, proceso que este partido realiza al amparo de la Ley de Primarias Presidenciales Compulsorias. De hecho, tanto el Partido Demócrata como el Partido Republicano tendrán acceso a copias de las listas para la celebración de las primarias presidenciales el año próximo. En este sentido, reiteramos que las interpretaciones que las agencias hagan de sus propias facultades merecen gran deferencia si son razonables y compatibles con su propósito legislativo. *Colón v. Méndez, Depto. Recursos Naturales*, 130 D.P.R. 433 (1992).

Enfatizamos que la solicitud de las listas, los potes de tinta y las lámparas no las hace cualquier particular a la C.E.E. Se trata de una petición formal de un partido político afiliado inscrito conforme a la Ley de Primarias Presidenciales Compulsorias, hecha al Presidente de la C.E.E. para que brinde cooperación al primero en su proceso de reorganización al amparo del deber que le impone la Ley Electoral de Puerto Rico.

En conclusión, la venta de las listas electorales, los potes de tinta y el préstamo garantizado de las lámparas no constituye una utilización de fondos públicos tal como prohíbe la Ley de Primarias Presidenciales Compulsorias.

Por todo lo antes expuesto, *procede confirmar la sentencia recurrida.*

*Se dictará la sentencia correspondiente.*

Los Jueces Asociados Señores Negrón García y Rebollo López emitieron opiniones disidentes. La Juez Asociado Señora Naveira de Rodón y el Juez Asociado Señor Fuster Berlingeri no intervinieron.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

Para recuperar su libertad el hombre necesita, ante todo, *recobrar una conciencia plena de la realidad.* Saber, en otros tér

minos, que derribados los tiranos, abandonadas las ideologías, conquistado el bienestar y la seguridad material, no es un hombre libre. *Que a las tiranías visibles y concretas de antaño se han sustituido mil tiranías invisibles, a las cuales es preciso identificarlas y llamarlas a cada una por su nombre.* Saber en definitiva, que la libertad debe ser entendida a la vez como *verdad*, como amor y como comprensión humana. (Énfasis suplido.) G. Uscatescu, *Aventura de la Libertad*, Madrid, Centro de Estudios Constitucionales, 1966, pág. 113 y ss.

# I

Es inconstitucional la Ley Núm. 91 de 28 de julio de 1995 (16 L.P.R.A. sec. 1353) —enmendatoria de la Ley de Primarias Presidenciales Compulsorias, Ley Núm. 6 de 24 de septiembre de 1979 (16 L.P.R.A. sec. 1321 *et seq.*)— que *obliga* a los partidos afiliados a los nacionales a celebrar unas primarias dirigidas a la reorganización interna para acogerse al uso de fondos públicos. Seguimos ante un diseño estatutario endeble y quebradizo, que induce a la confusión del elector y cuya intención, a todas luces, es —mediante unos subterfugios hábilmente esquematizados— soslayar una *verdad* nunca contradicha: *LOS PUERTO-RRIQUEÑOS NO TENEMOS DERECHO A VOTAR POR EL PRESIDENTE Y VICEPRESIDENTE DE ESTADOS UNIDOS.*

La *compraventa*, entrega y eventual circulación de las listas electorales al Partido Demócrata afiliado para una reorganización interna, según autorizado por el Presidente de la Comisión Estatal de Elecciones, es una afrenta directa al *derecho de intimidad* de los miles de electores independentistas que integran el Partido Independentista Puertorriqueño (en adelante P.I.P.), y que legítimamente se oponen a la celebración de las llamadas primarias de partidos afiliados nacionales. Además, infringe la Ley Electoral de Puerto Rico y el Reglamento Electoral, amén de quebrantar el *principio de neutralidad* en el cual se apuntala

nuestra Constitución en materia de *status* (relación política con Estados Unidos).

*Despojada de su etiqueta de "primaria", el evento de reorganización interna, pautado para el próximo domingo 24 de septiembre de 1995, es sólo una antesala que persigue medir las fuerzas de los electores del Partido Nuevo Progresista (en adelante P.N.P.) frente al Partido Popular Democrático (en adelante P.P.D.), sobre sus candidatos oficiales al puesto de Comisionado Residente en Washington, el Lcdo. Carlos Romero Barceló y la Sra. Celeste Benítez Rexach, respectivamente.* Elaboremos.

## II

*Vulneraciones al derecho al voto; características y requisitos constitucionales, falacia de las primarias presidenciales*

Por imperativo constitucional, el voto de todo elector debe ser universal, igual, *directo*, secreto y libre de coacción. Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1. Este mandato significa que

... ese voto, en última instancia, *será ejercitado y tendrá realmente un valor y eficacia en la elección [directa] de determinados candidatos a puestos públicos.* Desprovisto de esa característica, ingrediente, consecuencia y valor, subsiste solamente como expresión privada, sin que le acompañe un efecto político-público fuera de las latitudes, jurisdicción o fronteras en que se desenvuelve el cuerpo político soberano.

El diseño constitucional electoral existente en Puerto Rico no lo autoriza. *La Asamblea Legislativa no puede por fiat extender credenciales ni status de partido político a agrupaciones cuyos integrantes no tienen el derecho a votar por unas posiciones ejecutivas a nivel federal en los Estados Unidos independientemente de la sabiduría o no de dicho fin.* Tal actuación carece del elemento consustancial e imprescindible soberano del cual dimana un poder público de esta naturaleza. La Ley ... es un mecanismo extraconstitucional negativo de los axiomas antes apuntados.

Estas circunstancias a juicio nuestro despojan el carácter público de la empresa y destruyen la validez y legalidad de la

asignación y desembolso ... y el uso de facilidades y personal de la Comisión Estatal de Elecciones en tales elecciones. ... *P.S.P. v. E.L.A.*, supra, págs. 623–624. (Énfasis en el original suprimido y énfasis suplido.) *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 648–649 (1988), opinión disidente.

Por esta razón es evidente que un voto en la reorganización interna *obligatoria* según la Ley Núm. 91, *supra* —como requisito previo para después acogerse al uso de fondos públicos— es un ejercicio fútil e ilusorio, pues no votamos en la elección *directa* de los candidatos a Presidente y Vicepresidente de Estados Unidos Ello revela la *verdadera naturaleza engañosa* de pretender movilizar a la ciudadanía para una reorganización que es simplemente " 'una actividad política descarnada de facciones e instituciones sectarias que promuevan fines políticos tales como la Estadidad y desarrollos políticos del Estado Libre Asociado, el patronazgo, favores y nombramientos desde las más altas esferas del Gobierno de Estados Unidos' ". (Énfasis suprimido.) *P.I.P. v. C.E.E.*, supra, págs. 633–634, opinión disidente.

En su reducto final, presenciamos de nuevo la degeneración de los más elevados postulados y principios de una verdadera democracia, suplantados por la cruda práctica de la PARTIDOCRACIA; a saber, el poder y la supremacía de los partidos mayoritarios del entorno político (P.N.P. y P.P.D.) sobre las estructuras institucionales del Gobierno.

Como reconoció el Lcdo. Miguel A. Hernández Agosto —actual Presidente del Partido Demócrata afiliado— al discutirse la legislación que nos ocupa, "[s]abemos que la política nacional en Puerto Rico se reduce a dos partidos locales, como cuestión práctica al Partido Nuevo Progresista y al Partido Popular Democrático". Apéndice de Apelación, pág. 61.

> ... [L]os partidos políticos afiliados están siendo controlados y dirigidos —además de necesaria y sustancialmente nutridos— por los dirigentes y los electores miembros de los partidos que ostentan o han tenido las riendas del Gobierno y controlado la

mayoría en la Asamblea Legislativa y el Poder Ejecutivo. ... [L]a radiografía de la estructura y miembros de los partidos políticos afiliados concluyentemente demuestra que son unos *alter ego* —por así decirlo, un espejo— de los dos partidos políticos principales que controlan la mayoría representativa en las cámaras legislativas. Aunque la ley no le atribuye e intenta negar efectos plebiscitarios, ciertos candidatos presidenciales del Partido Republicano nacional y sus líderes, al igual que algunos de los aspirantes a dirigir el Partido Demócrata local, han reclamado y reiterado que la participación en ambas primarias es un paso hacia la estadidad federada. La conclusión es innegable. *Los denominados partidos políticos afiliados son unos instrumentos de proselitismo político de los dos partidos mayoritarios P.N.P. y P.P.D., cuyos propósitos extraconstitucionales logran a través de las primarias.* (Énfasis en el original suprimido y énfasis suplido.) *P.I.P. v. C.E.E.*, supra, págs. 655–656.

La legislación que nos ocupa ignora que el derecho constitucional al voto, que tiene el elector puertorriqueño, de elegir los candidatos de su preferencia para regir los asuntos insulares *es dentro de la actual estructura política "convenida" con Estados Unidos*, cuyo andamiaje constitucional, repetimos, proclama la neutralidad de nuestro Gobierno en materia de *status*. Así lo dispuso el Pueblo como Soberano. No se acordó, como parte del pacto, que los puertorriqueños votaran por el Presidente y Vicepresidente de Estados Unidos.([1]) *Cualquier diseño legislativo u*

---

([1]) Reproducimos de nuestro disenso en *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 647–648 (1988):

"Por circunstancias particulares en la relación política prevaleciente, que no nos corresponde examinar, ni nuestra Constitución ni la de los Estados Unidos reconocen el derecho a que los electores de Puerto Rico voten por los candidatos a dichos cargos públicos. En otras palabras, no somos electores cualificados para votar con relación a dichos cargos ejecutivos federales. ¿Podría la Asamblea Legislativa [unilateralmente] otorgar dicha cualidad? Al presente nuestra fuente de poder político y público 'emana del pueblo y se ejercerá con arreglo a su voluntad, dentro de los términos del convenio acordado entre el pueblo de Puerto Rico y los Estados Unidos de América.' (Art. I, Sec. 1 Constitución). *R.C.A. v. Gobierno de la Capital*, 91 D.P.R. 416 (1964)." (Énfasis suprimido.)

Pero, "el ejercicio de un elector de su preferencia presidencial en las primarias, bajo esta ley, no es otra cosa que el votar en una consulta de quien a su juicio, en última instancia, debe ser seleccionado para presidente. Es un voto que permanece en el umbral del proceso. Desde este prisma podemos concluir que todo proceso primarista que intenta reglar el ejercicio de un voto sobre puestos públicos en los

*organismo que tienda a proclamarlo así, se basa en una premisa falaz.* Ninguna votación sobre reorganización interna o primarias podrá ser contabilizada para elegir al Presidente y Vicepresidente. *Se trata de un esquema legislativo engañoso e inconstitucional.*

## III

*Invasión al derecho de intimidad de los electores independentistas*

Brindar de forma gratuita u onerosa una copia oficial de las listas electorales, *atenta contra la prohibición* expresa del Art. 1.008 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3016,[2] y es una afrenta directa al derecho constitucional a la intimidad de los miles de electores independentistas que se oponen a la celebración de las primarias presidenciales en Puerto Rico.

El reclamo y la oposición a la entrega es comprensible ante la triste realidad histórica de la práctica deleznable de la Policía, bajo las administraciones del P.P.D. y P.N.P., de confeccionar y conservar indiscriminadamente unas listas y carpetas de personas que no comulgaban con sus ideologías, específicamente los independentistas del país. *Cf. Noriega v. Gobernador*, 130 D.P.R. 919 (1992); *Noriega v. Gobernador*, 122 D.P.R. 650 (1988).

*Primero*, la única información adicional que no se provee en las listas, y que está en el Registro Electoral, es el

---

cuales los electores no pueden constitucionalmente votar, es uno [sic] fallido, que según veremos, goza más bien de la característica de consulta o referéndum, para lo cual es menester proveer unas garantías especiales a los opositores. Puede exigirse responsabilidad, consecuencias y acatamiento a los resultados de los procesos eleccionarios del país, referéndums o plebiscitos cuando éstos no son discriminatorios y se han caracterizado por condiciones de razonable igualdad no presentes en la ley que nos ocupa". *P.I.P. v. E.L.A.*, 109 D.P.R. 403, 425 (1980).

(2) Prohíbe que se suministre o se provea a persona alguna "copias del Registro Electoral o de las tarjetas de identificación electoral, papeletas, actas de escrutinio o de las hojas de cotejo oficiales que hayan de utilizarse en una elección". 16 L.P.R.A. sec. 3016.

estado civil (nombre y apellidos del cónyuge), más una copia del acta de nacimiento.

*Es errónea, pues, la conclusión mayoritaria de que las listas de electores contienen una información limitada y no sirven para identificar su afiliación política.* Opinión del Tribunal, pág. 58. Contrario a ese aserto, tales listas de votantes informan su número de tarjeta electoral, nombre con apellidos paterno y materno, sexo, estatura, edad, lugar de nacimiento, nombre del padre y de la madre, y dirección permanente. En otras palabras, es una descripción exacta del elector en cuanto a su identidad, dirección, origen familiar y demás circunstancias personales; información que difícilmente pueda con seriedad caracterizarse como limitada. De hecho, tratándose de las últimas listas depuradas por la Comisión Estatal de Elecciones al mes de julio, tenemos la situación de que se trata de información personal íntima del más reciente cuño, susceptible de ser utilizada para fines de encuestas ideológicas.

*Segundo*, la mayoría enfatiza el obvio "interés público del legislador al querer proteger esta información personal de cada elector prohibiendo la venta del Registro Electoral". Opinión mayoritaria, pág. 58. Conocida la amplitud de la información, ¿cómo pueden caracterizar de "listado más sencillo", y permitir la compraventa de esas listas, por el mero hecho de no contener el estado civil del elector y el nombre de su cónyuge?([3]) A buen observador, bastará un análisis de los apellidos, el nombre de los progenitores y la dirección impresos para detectar el parentesco entre los cónyuges e hijos; esto es, de todo el núcleo familiar.

*Tercero*, la opinión mayoritaria alude al contenido "limitado" de las listas que han de entregarse, soslayando que esta prohibición estatutaria, desde su inicio, considera las peticiones de inscripción —fuente original de toda la infor-

---

([3]) Excluimos el dato de ciudadanía, pues para figurar en las listas tiene que haberla acreditado por nacimiento o naturalización.

mación personal y familiar contenida en las listas electora les— "documento *privado*". Esta prohibición descansa en la ineludible realidad de que el ciudadano, al inscribirse —como requisito previo al ejercicio de su derecho al sufragio— suministra información íntima de carácter personal y familiar que entrega al Estado en *la confianza de que la información vertida será utilizada únicamente para el propósito de seleccionar funcionarios electivos dentro del Gobierno del E.L.A.*; no para otros *intereses ajenos a éste.* La Asamblea Legislativa, como tampoco este Tribunal, no puede alterar esa investidura de intimidad; menos, en detrimento de los electores que componen el P.I.P.

*Cuarto*, la entrega del ciudadano de esta información privada al Estado para ese propósito restringido electoral genera un deber fiduciario de velar por que dicha información no sea utilizada por otras personas, salvo la Comisión Estatal de Elecciones y sus funcionarios. Coincidimos con el P.I.P. que su entrega para una reorganización interna "traiciona la confianza con que cada elector depositó su información personal en manos de la C.E.E.". Escrito de Apelación, pág. 10.

*Quinto*, la premisa en que la mayoría descansa es incorrecta; las listas de electores no "tienen amplísima distribución en el país". Dichas listas sólo se proveen *estrictamente* a los partidos principales que componen la Comisión Estatal de Elecciones y al Poder Judicial para la consecución de intereses apremiantes de naturaleza pública *que se proyectan sobre toda la ciudadanía* —sin distinción de credos ideológicos partidistas— a saber, la ejecución de los derechos fundamentales del voto y del juicio por jurado. *Difícilmente, la mayoría puede igualar ese acceso a las listas con el interés exclusivo de esta reorganización.*

Y *sexto*, la mayoría del Tribunal incide al implícitamente "equiparar el sistema electoral de Puerto Rico y al poder judicial con el proceso de reorganización interna del Partido Demócrata, en el cual lo que se va a decidir si

preside dicha organización la Prof. Celeste Benítez o el Lcdo. Carlos Romero Barceló, [con lo que] *subvierte el valor de los propósitos apremiantes que motivan facilitarle la lista a los partidos políticos y a los tribunales"*. (Énfasis suplido.) Escrito de Apelación, pág. 11.

Toda organización política mantiene o debe mantener un registro de todos sus miembros; ante un proceso de reorganización interna, *dicha lista es la que debe utilizarse. No es deber ni le corresponde a la Comisión Estatal de Elecciones ni al andamiaje electoral de los partidos políticos del país subsanar esa deficiencia.*

Si algo revela esta situación es que la Asamblea Legislativa —con todas las enmiendas introducidas a la Ley de Primarias Presidenciales Compulsorias— no ha podido superar el hecho de que "realmente ha creado por ficción unos partidos adicionales que no existen como tal, pues sus miembros necesariamente salen de las filas de los partidos principales locales puertorriqueños". *P.I.P. v. E.L.A.*, 109 D.P.R. 403, 421 (1980).

Precisamente, de esa creación ficticia legislativa surge la alegada necesidad de entregar las listas que tiene la Comisión Estatal de Elecciones; la inexistencia *bona fide* en el país de los partidos demócratas y republicanos requiere que se nutra de los miembros de los partidos locales existentes (P.N.P. y P.P.D.).

## IV

*Asignación y uso inconstitucional de fondos públicos*

Si bien la reciente Ley Núm. 91, *supra*, prohíbe la utilización de fondos públicos en el proceso de reorganización interna del Partido Demócrata afiliado al nacional, ello simplemente es una *veda transitoria*. De efectuarse dicha reorganización, ese partido será acreedor en su oportunidad a las asignaciones subsiguientes provenientes de fon-

dos públicos. Como corolario, las llamadas *compraventas* de las listas electorales y de la tinta indeleble por la suma total de siete mil dólares ($7,000) *es una falacia más*; un *anticipo* que el partido hace y cuya inversión le será *reembolsada* con creces con la eventual erogación de fondos públicos para las primarias de 7 de abril de 1996, una vez el Gobernador firme la Resolución Conjunta de la Cámara Núm. 2002 de 28 de febrero de 1995, que asigna siete millones de dólares ($7,000,000) a la Comisión Estatal de Elecciones para las primarias presidenciales.

*La relación inseparable entre la reorganización interna de ahora y las primarias subsiguientes sufragadas con fondos públicos es clara.* Evaluado de manera integral el presente esquema legislativo, vemos que es una forma indirecta e inconstitucional más del P.N.P. y P.P.D. para continuar usando los fondos públicos en unas *primarias*, sin valor electoral real alguno. *Convocar a la ciudadanía y pretender movilizarla como "electorado", a través de los poderosos medios de comunicación masiva, usándolos para realizar un simple sondeo de cuál de sus candidatos a Comisionado Residente goza de mayor simpatía en este momento, es una gran farsa.*

El uso de fondos públicos *bajo el espejismo* de partidos nacionales —sea en reorganización interna o en primarias— tiene además el grave defecto constitucional de favorecer económicamente a los dos (2) partidos puertorriqueños principales (P.N.P. y P.P.D.). Según expuesto, no podemos cerrar los ojos e ignorar que los ejecutivos del Partido Demócrata local tradicionalmente han sido los líderes del P.P.D., y los del Partido Republicano, del P.N.P. La posibilidad de que el P.N.P. acabe controlando ambos partidos —según se advierte de una lectura del debate legislativo— sólo hace más contundente esta realidad netamente partidista. Frente a ese supuesto, la negativa de los miembros del P.I.P. a participar en un proceso eleccionario que corresponde a Estados Unidos, más que evidente, es legítima.

Asignar fondos públicos para las próximas primarias es ayudar al P.N.P. y al P.P.D. a movilizar a sus miembros pocos meses antes de las elecciones generales.([4]) Las campañas primaristas de los partidos afiliados son meramente otro escenario para el forcejeo entre el P.P.D. y el P.N.P. por el electorado puertorriqueño, con miras a que su resultado influya en las elecciones generales subsiguientes.

En materia electoral, nuestra Constitución proclama la igualdad, para evitar las distorsiones que la ventaja económica inevitablemente causa en el proceso político.([5]) Exige paridad económica en toda legislación que asigne fondos públicos electorales, unos controles iguales del financiamiento de las campañas y límites a las contribuciones. Por tal razón, hemos sostenido la validez de los límites de las contribuciones que pueden hacer los ciudadanos y las personas jurídicas para las arcas de los partidos. A su vez, el Estado provee fondos para las campañas, bajo un criterio de rigurosa igualdad.

---

([4]) Ya en *P.I.P. v. E.L.A.*, supra, págs. 418–419, habíamos señalado que: "Como evento que involucra un segmento sustancial de la población, *todo proceso de primaria genera una campaña publicitaria, directa e indirecta, remunerada y gratuita. El atractivo de los nombres y símbolos adoptados, las posiciones de los candidatos y los intercambios de ideas, encuentran cabida, expresión y eco en la prensa radial, escrita y televisada del país.* La audiencia electoral aumenta. Las primarias, en su fase preparatoria y eleccionaria, producen entusiasmo entre los seguidores de los distintos candidatos y partidos políticos. Constituyen un *medio efectivo de propaganda* para mantener activa la agrupación política, y vivas las controversias de importancia. *En ese sentido los estudiosos reconocen que toda primaria representa un vehículo positivo de proselitismo político para partidos y candidatos ganar adeptos a sus causas.*" (Énfasis suplido.)

([5]) En nuestro disenso en *P.I.P. v. C.E.E.*, supra, págs. 643–644, señalamos que bajo la Constitución del Estado Libre Asociado "no existe un mandato mayoritario, expreso y previo que les obligue, producto de un *referéndum, plebiscito o enmienda constitucional* —en que se le haya dado la oportunidad de votar a favor o en contra a todos los electores capacitados del país— sobre la trascendental decisión de incorporar al proceso eleccionario puertorriqueño —*financiado y pagado por todos sus contribuyentes*— un reconocimiento a los trámites internos y gestiones de los partidos nacionales de Estados Unidos con miras a lograr alguna participación colectiva en la nominación de candidatos a presidente y vicepresidente. Ello vulnera el principio igualitario que sirve de fundamento y premisa elemental para *sostener la legalidad de los desembolsos de unos fondos públicos.* Esos fondos no están asequibles a todos en las urnas, en la lid electoral en que se miden, en igualdad de condiciones, las alternativas ideológicas o decisiones fundamentales que constituyen un cambio o una redefinición de las relaciones básicas entre Puerto Rico y Estados Unidos, según la Constitución." (Énfasis en el original.)

El esquema de primarias beneficia directamente al P.P.D. y P.N.P., por el aumento a los límites de las contribuciones individuales que pueden recibir a través de esos partidos *alter ego*.

Finalmente, no debemos olvidar que, aparte de favorecer a uno u otro partido específico, el uso posterior de fondos para las primarias de los partidos nacionales tiene el efecto de fomentar *una mayor integración entre Puerto Rico y Estados Unidos, lo que atenta contra la neutralidad en asuntos de "status" que apuntala nuestra Constitución.*

Con vista a estas consideraciones, disentimos. Como remedio judicial mínimo, la mayoría del Tribunal —a tono con la doctrina igualitaria y nuestro disenso expuestos en *Berríos Martínez v. Gobernador I*, 137 D.P.R. 191 (1994), debió concederle al P.I.P. un acceso proporcional de fondos públicos para que pudiese hacer campaña en contra de la participación de los puertorriqueños en la reorganización interna y el proceso primarista relacionado con los partidos nacionales.

— O —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

Como expresáramos hace poco más de siete (7) años, en la opinión disidente que emitiéramos en *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 664 (1988) —caso en que el Partido Independentista Puertorriqueño (en adelante P.I.P.) cuestionó la constitucionalidad de la Ley de Primarias Presidenciales Compulsorias, y este Tribunal, mayoritariamente, sostuvo la misma— "[r]efrendar con nuestro voto la opinión mayoritaria emitida tendría dos efectos: complacer nuestro criterio o preferencia personal y traicionar nuestra consciencia judicial".

El juramento que prestamos el día que tomamos posesión del cargo que ocupamos nos obliga, en todo caso, a

descartar nuestra preferencia personal y a actuar con total objetividad e imparcialidad jurídica. Así determinado, la conclusión en el presente caso no puede ser otra que la de que resulta ser *inconstitucional* la celebración de primarias presidenciales en Puerto Rico, costeadas las mismas con fondos públicos, meramente a base de una *ley* aprobada por la Asamblea Legislativa.

## I

Un examen de las discusiones habidas en la Convención Constituyente de Puerto Rico demuestra que, al adoptarse la Constitución del Estado Libre Asociado de Puerto Rico, se estableció un *esquema conceptual de neutralidad*, esto es, un *"fino balance"* entre los tres (3) pensamientos o ideologías políticas imperantes en nuestro País —a saber, la autonomía, la independencia y la estadidad— reservándose el Pueblo de Puerto Rico, insularmente y bajo nuestra Constitución, el derecho a decidir sobre ese destino.(¹)

La legislación que autoriza la celebración de primarias presidenciales en Puerto Rico —sin consulta *previa* al pueblo sobre ello— tiene el efecto de *alterar* ese "fino balance" o de inducirlo a favorecer un determinado cauce político; esto es, cualquier estatuto a esos efectos constituye un *intento solapado* de la Asamblea Legislativa —tradicionalmente dominada por proponentes de dos (2) de las fórmulas políticas— de *modificar sustancialmente* el *status* o destino político de Puerto Rico, facultad que específicamente le fue reservada al pueblo.

No necesita una persona ser muy perspicaz ni inteligente para poderse dar cuenta del hecho de que la celebración de primarias presidenciales tiene el efecto de *adelantar o promover* los intereses políticos de los partidos que en

---

(¹) Ello así, independientemente del debate sobre el poder o facultad que pueda tener el Gobierno de Estados Unidos para disponer, *de manera unilateral*, de nuestro destino político final; hecho que *no* está en controversia en el presente caso.

Puerto Rico propulsan la estadidad y la unión permanente con Estados Unidos; ello en *detrimento sustancial* de los intereses del partido político que, por el contrario, promueve el ideal de la independencia como destino político final de nuestro País.

En otras palabras, resulta evidente el *carácter sectario* de las primarias presidenciales. La *fuerza motriz* que impulsa el proceso primarista lo constituye el *interés* de los dos (2) partidos políticos de mayoría de *lograr acceso* a los *centros de poder* en Washington, D.C., con el *propósito* de obtener concesiones que favorezcan su gestión y fortalezcan su posición política en Puerto Rico; situación que tiene el efecto de *discriminar* contra el sector ideológico que propulsa la independencia para Puerto Rico.([2])

En ello, a la luz de nuestra realidad constitucional, *es que radica la violación a la cláusula constitucional sobre la Igual Protección de las Leyes*. La Ley de Primarias Presidenciales Compulsorias —no obstante aparentar ser neutral, no establecer clasificaciones de su faz, y tener el propósito procesal de proveer un sistema racional y seguro que viabilice la participación de los puertorriqueños, que lo deseen, en las primarias de los partidos políticos de Estados Unidos— *vulnera* la referida cláusula constitucional por razón de que el *propósito obvio* de la Asamblea Legis-

---

([2]) Es de notar que la celebración de "primarias presidenciales" en Puerto Rico constituye, *si es que se quiere que ello tenga algún sentido lógico*, un "paso inicial" hacia la *eventual solicitud* por los puertorriqueños al Congreso del derecho a votar directamente por el Presidente de Estados Unidos y/o de la estadidad como destino final político de este noble pueblo.

En relación a ello, resulta procedente *señalar y enfatizar* que en fecha reciente los proponentes de la fórmula de la estadidad *fallaron en convencer* a la mayoría de los ciudadanos puertorriqueños de las "bienandanzas y ventajas" de dicha forma política; teniendo dicha "falla" la consecuencia de que la referida fórmula resultara derrotada en el plebiscito que a esos efectos se celebrara.

En vista a dicha situación, *cabe preguntarse* cuál sería el resultado de una consulta formal al pueblo puertorriqueño sobre si interesa, o no, que se celebren dichas primarias presidenciales, costeadas las mismas con fondos públicos en lugar de privadamente.

Realmente, *no* nos atrevemos a hacer un vaticinio al respecto.

lativa al promulgarla, *y su efecto*,(³) es el de alterar el proceso político puertorriqueño, inclinando la balanza a favor de determinados sectores ideológicos en detrimento de otros.

*Es por ello que poco importa que en el presente caso se trate de "elecciones primaristas internas de reorganización" y no de las primarias presidenciales propiamente dichas.* Como correctamente se expresa en la opinión mayoritaria, pág. 63, "el proceso primarista de reorganización interna *se exige* en función de la *posterior celebración* de las primarias presidenciales". (Énfasis suplido.) *Ambos procesos, en consecuencia, resultan violatorios de nuestra Constitución.*

## II

Pero, *hay más.* La actuación del Presidente de la Comisión Estatal de Elecciones, al vender las listas electorales al "Partido Demócrata", *resulta violatoria, inclusive, de la propia Ley Electoral de Puerto Rico*, 16 L.P.R.A. sec. 3001 *et seq.*

El referido estatuto —en sus Arts. 1.011 (A)(n) y 1.016 (16 L.P.R.A. secs. 3007(A)(n) y 3016)— *expresamente prohíbe* que el Presidente de la Comisión Estatal de Elecciones venda o suministre, a "persona" alguna, copias del "Registro Electoral" o del "Registro General de Electores" o del "Registro del Cuerpo Electoral de Puerto Rico".

Conforme a la opinión mayoritaria emitida, los "listados electorales" que el Presidente de la Comisión Estatal de Elecciones le vendió al "Partido Demócrata" constituyen un "listado más sencillo" de la información o récord que componen el "Registro Electoral". Según se expresa en la opinión mayoritaria, estas "listas electorales" contienen "información relacionada [o circunscrita] al nombre, número de tarjeta electoral, precinto y unidad del elector", *mien-*

---

(³) *Washington v. Davis*, 426 U.S. 229 (1976); *Castaneda v. Partida*, 430 U.S. 482 (1977); *Griffin v. School Board*, 377 U.S. 218 (1964).

*tras que* el "Registro Electoral" contiene información "más amplia" sobre dicho elector, tal como nombre del padre y la madre, sexo, color de ojos y estatura, lugar y fecha de nacimiento, estado civil, etc.

Basado en esta alegada "diferencia" —esto es, que las "listas electorales" vendidas contienen información "más limitada" que el "Registro Electoral"— la mayoría de los integrantes del Tribunal resuelve que el Presidente de la Comisión Estatal de Elecciones *no* violó la *expresa prohibición* de vender, contenida la misma en los antes citados Arts. 1.011(A)(n) y 1.016 de la Ley Electoral.

Dicha determinación o conclusión —dicho con respeto y cariño— constituye un absurdo que *no* requiere mucha argumentación en contra. De manera incomprensible, la mayoría resuelve que, no obstante la *veda absoluta de vender* el "Registro Electoral" que le impone la vigente Ley Electoral al Presidente de la Comisión Estatal de Elecciones, éste puede vender un "resumen" del mismo. "Cosas raras veredes", dijo el filósofo en tono alarmado, al recordar la *innegable realidad* de que "si no se puede lo más, ciertamente no se puede lo menos". Esto es, y meramente a manera de ejemplo, si al autor del libro se le prohíbe vender el mismo, tampoco puede éste vender un extracto de dicho libro.

El hecho de que la Ley Electoral de Puerto Rico autorice a la Comisión Estatal de Elecciones a entregar a los partidos políticos copia de las listas electorales con sesenta (60) días de anticipación a la celebración de las elecciones generales de Puerto Rico, *no* constituye fundamento jurídico válido para sostener que el Presidente las pueda vender a otras personas o entidades en violación de la *expresa prohibición* que contiene dicha Ley Electoral de Puerto Rico. La entrega de las referidas listas a los partidos políticos antes de las elecciones generales constituye un *imperativo práctico*; el legislador, sin embargo, entendió que dichas listas, y el Registro Electoral del que provienen las mis-

mas, *no* pueden ser vendidas a persona alguna por el Presidente de la Comisión Estatal de Elecciones. *Después de todo, debe mantenerse presente que la Comisión Estatal de Elecciones no existe para, ni está en el "negocio" de, la venta de listas electorales.*

### III

Pero, *todavía hay más.* Como es sabido, la Sec. 9 del Art. VI de la Constitución de Puerto Rico establece, en lo pertinente, que "[s]ólo se dispondrá de las propiedades y fondos públicos *para fines públicos* y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley". (Énfasis suplido.) Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 369. En el antes citado caso de *P.I.P.* v. *C.E.E.*, ante, este Tribunal hizo una *distinción* entre los procesos de primarias presidenciales y los procesos de reorganización interna de los partidos políticos de Estados Unidos. Resolvió, en cuanto a las primarias presidenciales, que su celebración constituye "suficiente fin público" como para permitir que la Asamblea Legislativa las regule y financie. Por otro lado, resolvió este Foro que el Estado *no* puede hacer uso de fondos públicos en los procesos internos de reorganización de dichos partidos. En cuanto a este aspecto, por último, es de notar que la vigente Ley de Primarias Presidenciales Compulsorias igualmente prohíbe el uso de fondos públicos en dichos procesos internos de reorganización.

Consciente la mayoría de lo anteriormente expresado, resuelve que no hay erogación ilegal de fondos públicos, en relación con el proceso interno de reorganización que ante este Tribunal hoy se impugna, por cuanto el Presidente de la Comisión Estatal de Elecciones no "regaló" las listas electorales sino que las vendió por cinco mil dólares ($5,000) y, enfatiza la mayoría, el hecho de que dicho precio "no ha sido cuestionado por el P.I.P.". Asumiendo, *a los fi-*

*nes de la argumentación,* la constitucionalidad de la Ley de Primarias Presidenciales Compulsorias, nos enfrentamos a dicho argumento.

No hay duda que nuestro derecho es uno "rogado". Ello, *de ordinario,* sería suficiente para disponer de la cuestión de si el precio exigido de cinco mil dólares ($5,000) constituye, o no, suficiente y adecuada compensación. *Ahora bien,* tratándose de una situación que está *expresamente* prohibida por nuestra Constitución, cabe preguntarse si el foro judicial tiene, o no, el deber de investigar, motu proprio, si dicha compensación es una que es, o no, suficiente, o, por el contrario, debe descansar en las alegaciones de las partes al respecto.

Somos del criterio que esta disposición constitucional, la cual es de singular importancia no sólo en nuestro ordenamiento sino que puede acarrear graves consecuencias en nuestra vida diaria como pueblo, requiere que el foro judicial sea un poquito más "acucioso y enérgico". En nuestra opinión, el tribunal de instancia venía en la obligación de celebrar una vista evidenciaria al respecto con el propósito de asegurarse que *no* se encontraba ante una situación de erogación ilegal de fondos públicos; ello independientemente de si las partes le habían planteado, o no, dicho asunto.

IV

*En resumen,* no estamos en contra de la celebración de unas "primarias presidenciales" en nuestra Isla, costeadas las mismas con fondos públicos, *siempre que* el pueblo sea consultado, de manera formal y previa, respecto a la celebración de las mismas —proceso en que los representantes autorizados de todas las ideologías políticas tengan la oportunidad de dirigirse, y educar, a la ciudadanía respecto a sus diferentes puntos de vista— *y/o siempre que,* en ausencia de esa consulta previa y formal, dichas primarias

sean *costeadas privadamente* por todos aquellos interesados en participar en las mismas.

Por las razones antes expresadas, revocaríamos la sentencia emitida en el presente caso por el Tribunal de Primera Instancia, Sala Superior de San Juan.