EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Jesús Cruz Negrón<br><br>Recurrido<br><br>v.<br><br>Administración de Corrección<br><br>Peticionaria | Certiorari<br><br>2005 TSPR 34<br><br>163 DPR _____ |

Número del Caso: CC-2004-359

Fecha: 28 de marzo de 2005

Tribunal de Apelaciones:

        Región Judicial de San Juan

Juez Ponente:

        Hon. Dolores Rodríguez de Oronoz

Abogado de la Parte Recurrida:

        Lcdo. Pedro J. Reyero

Oficina del Procurador General:

        Lcda. María Astrid Hernández Martín
        Procuradora General Auxiliar

        Lcda.. Zaira Z. Girón Anadón
        Procuradora General Auxiliar

Materia: Reclasificación de Confinado

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Jesús Cruz Negrón

     Recurrido

       v.                 CC-2004-359    Certiorari

Administración de Corrección

     Peticionaria

Opinión del Tribunal emitida por el Juez Asociado SEÑOR CORRADA DEL RÍO

San Juan, Puerto Rico, a 28 de marzo de 2005.

El señor Jesús Cruz Negrón (el recurrido) extingue una pena de reclusión desde el 8 de octubre de 1987. A los 23 años de edad, éste fue sentenciado a cumplir cuatro (4) términos consecutivos de noventa y nueve (99) años de reclusión por los delitos de asesinato en primer grado, tentativa de asesinato, y dos (2) violaciones a la Ley de Armas de Puerto Rico, 25 L.P.R.A. 411 et seq. Fue sentenciado como delincuente habitual, debido a una convicción previa por incurrir en el delito de apropiación ilegal agravada y otra convicción por violación al Art. 406 de la Ley de Sustancias Controladas.

Desde el 4 de noviembre de 1987, fue clasificado en un nivel de custodia máxima.

El 8 de enero de 2003, el recurrido presentó una petición de reclasificación del nivel de custodia ante el Comité de Clasificación y Tratamiento de la Administración de Corrección (el Comité). El 28 de abril de 2003, el Comité reevaluó el nivel de custodia del recurrido y determinó que éste debía permanecer en un nivel de custodia máxima. En apoyo de tal decisión, expresó lo siguiente:

> Como medida de tratamiento. Por la naturaleza de los delitos de carácter extremo. Sentencia extremadamente alta. Poco tiempo cumplido con relación a la misma. Le falta más de 5 años para ser considerado por la Junta LBP. No obstante, tomamos en conocimiento que el confinado ha cumplido 16 años y 1 mes de sus sentencia en custodia máxima. Entendemos que este tiempo no es comparativo con la sentencia impuesta por el Honorable Tribunal. Ha [sic] esto añadimos que el confinado fue declarado delincuente habitual y las sentencias impuestas para todos los delitos aparejan sentencias de 99 años consecutivas entre sí. Por lo que el confinado deberá permanecer observando ajuste por un tiempo adicional. Ubicación actual. Para que se beneficie de los programas disponibles y complete su 4to año.[1]

Inconforme, el recurrido apeló la decisión ante el Director de Clasificación, quien sostuvo la misma por razones similares. Determinó el Director que, aunque el recurrido ha llevado esfuerzos legítimos para beneficiarse de los servicios ofrecidos por la

---

[1] Véase Apéndice, a las pág. 10-11.

Institución, el tiempo cumplido en confinamiento debe ser proporcional a la sentencia impuesta. En consecuencia, estimó que el recurrido debía permanecer tiempo adicional en custodia máxima, continuar observando buenos ajustes y finalizar el Cuarto Año de escuela superior durante ese período.

De esa determinación, el recurrido acudió mediante recurso de *revisión* ante el Tribunal de Apelaciones (T.A.) el 24 de septiembre de 2003. Estimó dicho foro que el recurrido, tras dieciséis (16) años clasificado en custodia máxima, observaba un excelente desempeño y no había sido objeto de acciones disciplinarias, por lo que resulta arbitrario que, sin algún fundamento que no sea el largo de la sentencia, la Administración de Corrección determine que el recurrido deba permanecer observando ajustes por un tiempo adicional. Finalmente concluyó, que los fundamentos expresados por el Comité no cumplen con los criterios establecidos en el Manual de Reglas de 1979.

De ese dictamen, el 28 de abril de 2004, el Procurador General recurrió ante nos mediante recurso de *certiorari,* en el cual planteó la comisión del siguiente error:

> "Erró el Tribunal de Apelaciones al abrogarse las funciones de la Administración de Corrección y así remover del nivel de custodia máxima a un confinado que ha sido sentenciado, como delincuente habitual, a cerca de cuatrocientos (400) años de prisión

revisando *de novo* la determinación de la agencia."

Examinado el recurso, concedimos al recurrido un término de treinta (30) días para que mostrara causa por la cual no debíamos revocar el dictamen del T.A.. Éste cumplió oportunamente con lo ordenado mediante "Escrito en Cumplimiento de Orden".

Así las cosas, el 4 de octubre de 2004, el recurrido presentó una moción informativa y de desestimación, mediante la cual nos notificó que había sido reclasificado a un nivel de custodia de mediana seguridad y, por consiguiente, el caso se había convertido en uno académico. Examinado el escrito, concedimos al Procurador General un término de veinte (20) días para que compareciera y mostrara causa por la cual no debíamos desestimar el recurso por académico. El 29 de noviembre de 2004, el Procurador General presentó su escrito en cumplimiento de dicha orden. Sostuvo que el caso de autos no debe ser desestimado, toda vez que presenta una excepción a la norma de academicidad por constituir una cuestión recurrente o susceptible de volverse a repetir. El 20 de diciembre de 2004, el recurrido presentó un escrito en oposición al presentado por el Procurador General.

Consideradas las posiciones de ambas partes, estamos listos para resolver.

II

De entrada, debemos precisar que un asunto no es justiciable, cuando se trata de resolver una cuestión política; cuando una de las partes no tiene capacidad jurídica para promover el pleito; cuando después de comenzado el pleito, hechos posteriores lo convierten en académico; cuando las partes buscan obtener una "opinión consultiva"; o cuando se promueve un pleito que no está maduro. *Noriega v. Hernández Colón*, 135 D.P.R. 406, 422-21 (1994).

En el normativo caso de *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958), expresamos que un pleito es académico cuando la sentencia que sobre el mismo se dictare, "[ ... ] por alguna razón, no podrá tener efectos prácticos". Abundando sobre el tema, en *Com. de la Mujer v. Srio. De Justicia*, 109 D.P.R. 715, 724-725 (1980), resolvimos que el concepto de lo "académico" en la litigación "recoge la situación en que, aun cumplidos todos los requisitos de justiciabilidad, los cambios fácticos o judiciales acaecidos durante el trámite judicial de una controversia, tornan en académica o ficticia su solución". Al examinar la academicidad de un caso, debemos evaluar los eventos anteriores, próximos y futuros, a fines de determinar si su condición de controversia viva y presente subsiste con el transcurso del tiempo. *Pres. Del Senado*, 148 D.P.R. 737, 759 (1999). En *Asociación de Periodistas v. González*

*Vázquez*, 127 D.P.R. 704 (1991), citando al Profesor Tribe, expusimos que "[u]na vez se determina que un caso es académico los tribunales, por imperativo constitucional (ausencia de 'caso o controversia') o por motivo de autolimitación judicial, deben abstenerse de considerarlo en sus méritos. Sin embargo, aun ante la presencia de un caso evidentemente académico, las complejidades de la doctrina nos llevan a preguntarnos si existe alguna razón que mueva al tribunal a considerar tal caso impregnado de academicidad".

Bajo ese tenor, se han elaborado una serie de excepciones que, de estar presente alguna de ellas, permiten que se considere un caso posiblemente académico, a saber: "cuando se plantea una cuestión recurrente; si la situación de hechos ha sido modificada por el demandado, pero no tiene características de permanencia; o donde aspectos de la controversia se tornan académicos, pero persisten importantes consecuencias colaterales". *Angueira v. J.L.B.P.*, 150 D.P.R. 10 (2000).

La excepción sobre el carácter recurrente o repetitivo de la controversia exige el estudio de tres (3) factores: la probabilidad de la recurrencia; las partes involucradas en el procedimiento; y la probabilidad de que la controversia evada adjudicación o revisión judicial.

Cuando existe la probabilidad de que la controversia se repita o recurra, los tribunales deben considerar el

asunto planteado a pesar de que el mismo haya advenido académico.

En cuanto a las partes en litigio, para que aplique la excepción del carácter recurrente no es necesario que al repetirse la controversia ésta afecte a las mismas partes. *Com. de la Mujer v. Srio. de Justicia*, *supra*.

Además del carácter recurrente o repetitivo del asunto planteado, y las partes en litigio, dicho asunto debe ser de una naturaleza tal que evada su adjudicación o revisión. Esto sucede con mayor frecuencia en aquellas controversias que son de por sí de muy corta duración, aunque pueden existir otras que ocasionen que una controversia eluda la revisión judicial. *Asociación de Periodistas v. González Vázquez*, *supra*.

Así, al evaluar la procedencia de este recurso, debemos concentrar nuestro análisis en la relación existente entre los eventos que originaron el pleito y la adversidad presente. Bajo estas normas, no albergamos duda de que el caso de autos proyecta, por su singularidad, probabilidades sustanciales de recurrencia sobre controversias similares y, además, por la naturaleza del procedimiento de reclasificación de custodia puede ser susceptible de evadir la revisión judicial.[2] *Angueira v. J.L.B.P.*, *supra*.

---

[2] El Manual de Reclasificación de Confinados contempla una disposición especial para confinados encarcelados continuamente desde antes de 1 de mayo de 1996, mediante la cual se establece que la puntuación del

continúa...

Resuelto lo anterior, procedemos a atender el caso en sus méritos.

III

En el caso de autos, el recurrido cuestionó ante el T.A. la determinación de la Administración de Corrección de mantenerle en un nivel de custodia máxima. Alegó que durante 16 años ha exhibido una buena conducta, y se ha beneficiado de los servicios de rehabilitación y trabajo que ofrece la institución carcelaria en la que cumple su condena. A su juicio, ello le merece ser reclasificado a un nivel de custodia mediana.

La controversia ante nos se ciñe a determinar si la buena conducta exhibida por un confinado y la participación de éste en programas de rehabilitación y trabajo son <u>los únicos factores</u> que la Administración de Corrección deberá tomar en cuenta al momento de determinar si procede un cambio en su nivel de custodia. Sin duda alguna, la respuesta a esta interrogante claramente debe ser en la negativa. Veamos.

---

... 2 continuación

instrumento de clasificación no redundará en un aumento del nivel de custodia de ningún confinado que haya estado encarcelado desde antes de esa fecha, a menos que la puntuación del confinado produzca un nivel mayor de custodia sólo como resultado de una o más violaciones disciplinarias o uno o más delitos cometidos después de la referida fecha. Aunque esta disposición es aplicable al caso ante nos, es inescapable el hecho de que el acusado, aun siendo reclasificado a un nivel de custodia mediana, debe recibir una revisión cada doce (12) meses. Por esta razón, el asunto aquí planteado es susceptible de repetición.

La Sección 19 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico preconiza que "[s]erá política pública del Estado… reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva y propender, dentro de los recursos disponibles, al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social". Para cumplir con dicho mandato, la Ley Habilitadora de la Administración de Corrección, Ley Núm. 116 de 22 de julio de 1974 (4 L.P.R.A. §1112 (a) y (c)), faculta a dicha entidad a "[e]structurar la política pública en el área de corrección" y a "[f]ormular... la reglamentación interna necesaria para los programas de diagnóstico, clasificación, tratamiento y rehabilitación de la clientela del sistema correccional".

De acuerdo a esta facultad estatuida, y a tenor con la política pública del Estado Libre Asociado de Puerto Rico, la Administración de Corrección adoptó el "Manual de Reglas para Crear y Definir Funciones del Comité de Clasificación y Tratamiento de las Instituciones Penales", Reglamento Núm. 2485 de 27 de febrero de 1979, y el "Manual de Clasificación de Confinados", Reglamento Núm. 6067 de 22 de enero de 2000. Ambos reglamentos limitan la discreción de la Administración de Corrección en todos los asuntos relacionados con la clasificación de custodia de un confinado.

La determinación administrativa relativa al nivel de custodia asignado a un confinado requiere que se realice un adecuado balance de intereses. Por una parte, estará el interés público de lograr la rehabilitación del confinado, así como el de mantener la seguridad institucional y general del resto e la población penal; de la otra, estará el interés particular del confinado de permanecer en un determinado nivel de custodia. Además, al momento de determinarse la procedencia de un cambio en el nivel de custodia, deberán considerarse una serie de factores subjetivos y objetivos, para cuya atención se requiere la pericia de la Administración de Corrección.

Entre los criterios subjetivos se destacan: (1) el carácter y actitud del confinado, (2) la relación entre éste y los demás confinados y el resto del personal correccional, (3) el ajuste institucional mostrado por el confinado, entre otros. Por otro lado, entre los criterios objetivos que tomará la agencia para emitir su recomendación se encuentran: (1) la magnitud del delito cometido, (2) la sentencia impuesta, (3) el tiempo cumplido en confinamiento, entre otros. Véase Regla 10 del Manual de Reglas de 1979, *supra* (en adelante, Manual de Reglas de 1979).

Para documentar el proceso de reclasificación del nivel de custodia de un confinado, a los factores antes expresados se les asigna una puntuación. A base del resultado que se obtenga, es que la Administración de

Corrección recomienda un nivel de custodia que puede variar entre máxima, mediana, mínima o mínima-comunitaria. En específico, entre los criterios objetivos que adopta el Manual de Clasificación de Confinados de 2000, *ante*, se encuentran: (1) la gravedad de los cargos y condenas actuales, (2) historial de delitos graves previos, (3) historial de fuga, (4) historial de acciones disciplinarias, (5) condenas previas de delitos graves como adulto, (6) edad del confinado, entre otros. *Véase* Sección 7 del Manual de Confinados, *supra*. Si la suma de los primeros tres (3) factores es mayor de 7, el confinado deberá ser asignado a un nivel de custodia máxima. En caso contrario, se entran a considerar los demás factores. Si el resultado obtenido resultara ser menor de 5, y no existen órdenes de arresto o detención en contra del confinado, la escala recomienda un nivel de custodia menor. No obstante, la escala también contempla varios renglones de **modificaciones discrecionales**, para aumentar o disminuir el nivel de custodia, entre los cuales se encuentran la gravedad del delito, el historial de violencia excesiva, la afiliación prominente con gangas, el que el confinado sea de difícil manejo, entre otras. Las instrucciones para completar el formulario de reclasificación de custodia establecen que en la categoría de otras se podrá incluir cualquier otro atributo relacionado con el confinado que justifique una modificación a un nivel de custodia más alto.

En específico, la Regla 10 del Manual de Reglas de 1979, *supra*, dispone expresamente que "[e]n toda evaluación de un caso en que se considere la asignación de tipo de custodia... deberán tenerse presente [también] los delitos cometidos, las circunstancias de éstos, la extensión de la sentencia dictada, tiempo cumplido en confinamiento y aquellos factores que garanticen la seguridad institucional y [de la sociedad en general]. En cuanto a este aspecto –la seguridad institucional–, al evaluar conjuntamente esta gama de criterios, los tribunales han determinado que el interés público en la rehabilitación de la población penal y en la seguridad institucional debe prevalecer sobre el interés particular del confinado en permanecer en un nivel de custodia en específico o en determinada institución penal.

Según el Manual, es al Comité de cada institución carcelaria a quien corresponde realizar la evaluación periódica correspondiente al nivel de custodia asignado a los confinados. En los casos en que el confinado se encuentre en un nivel de custodia máxima, la evaluación periódica se hará cada 6 meses desde que se cumple el primer año en tal clasificación. En el resto de los casos (custodia intermedia, custodia mínima, custodia mínima-comunitaria), la evaluación se realizará cada 12 meses. El propósito principal que persiguen estas evaluaciones periódicas es supervisar la adaptación del confinado y poder prestar oportuna atención a cualquier

situación pertinente que pudiera surgir. La Sección 7(II) del Manual aclara que "[l]a reevaluación de custodia no necesariamente tiene como resultado un cambio en la clasificación de custodia o en la vivienda asignada". Es decir, este proceso de reevaluación es realizado por el Comité para atender las necesidades del confinado, observar su progreso, y recomendar posibles cursos de acción en cuanto a su rehabilitación. Su efectiva reclasificación dependerá de otra serie de factores que han sido elaborados en los manuales y reglamentos antes discutidos, y los cuales tienen el efecto de limitar la discreción de la agencia al momento de adjudicar controversias relativas a la reclasificación de custodia de confinados.

Por lo general, la composición de estos Comités la conforman peritos en el campo tales como técnicos socio-penales y oficiales o consejeros correccionales.[3] Estos profesionales cuentan con la capacidad, preparación, conocimiento y experiencia necesaria para atender las necesidades de los confinados y realizar este tipo de evaluaciones. Por esta razón, una determinación formulada por el referido Comité debe ser sostenida por el foro judicial siempre que la misma no sea arbitraria o caprichosa y esté fundamentada en evidencia sustancial. Es decir, siempre que la decisión sea razonable, cumpla

---

[3] Si la decisión sobre la reclasificación de un confinado incluye un asunto relacionado con salud, un representante Institucional de Salud Correccional también deberá formar parte del Comité.

con el procedimiento establecido en las reglas y manuales, y no altere los términos de la sentencia impuesta, el tribunal deberá confirmarla.[4]

Esta conclusión no es inusitada, está ampliamente avalada por nuestras leyes y jurisprudencia tanto en el ámbito local como federal. De acuerdo con la Sección 4.5 de la Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. §2175, según ha sido interpretado previamente por este Tribunal, la revisión judicial de una actuación administrativa debe limitarse a evaluar la razonabilidad de la decisión recurrida, la cual deberá ser sostenida a menos que se demuestre que la misma es arbitraria o caprichosa. *Ramírez v. Depto. de Salud*, 147 D.P.R. 901 (1999), *Rivera Rentas v. A & C Development*, 144 D.P.R. 450 (1997); *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, 133 D.P.R. 521 (1991); *A.R.P.E. v. J.A.C.L.*, 124 D.P.R. 858 (1989). Esta ponderada norma de deferencia a las determinaciones fácticas administrativas, descansa en que las agencias, por razón de experiencia y conocimiento especializado, están en mejor posición para resolver las controversias surgidas en torno a los asuntos que le fueron encomendados por ley. *Id*.

Cobra vital importancia esta norma en aquellos casos en que la agencia revisada lo es la Administración de

---

[4] De no estar de acuerdo el confinado con la determinación del Comité, éste puede cuestionar la misma ante el Director de Clasificación. De encontrarse aún inconforme, puede solicitar la revisión judicial ante el Tribunal de Apelaciones.

Corrección en asuntos sobre la calificación de los confinados a los fines de determinar el nivel de custodia de éstos.

Cónsono con lo anterior, en Estados Unidos, tanto los tribunales federales como los estatales consistentemente han reconocido que las autoridades carcelarias poseen amplia discreción para adoptar e implementar las disposiciones reglamentarias necesarias para la consecución del interés del Estado en la rehabilitación de los confinados y en mantener la seguridad institucional y general. *Rhodes v. Chapman*, 425 U.S. 337 (1981); *Bell v. Wolfish*, 441 U.S. 540 (1979).

En *Bell v. Wolfish*, supra, el Tribunal Supremo de los Estados Unidos expresó lo siguiente:

> [T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgement are needed to preserve internal order and discipline and to maintain institutional security. […] Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters. […] We further observe that, on occasion, prison administrators may be "experts" only by Act of Congress or of a state legislature. But judicial deference is accorded not merely because the administrator ordinarily will, as a matter

> of fact in a particular case, have a
> better grasp of his domain than the
> reviewing judge, but also because the
> operation of our correctional facilities
> is peculiarly the province of the
> Legislative and Executive Branches of our
> Government, not the Judicial.

Esta doctrina fue reiterada en *Hewitt v. Helms*, 459 U.S. 469 (1983) a la pág. 474, en el cual dicho foro sostuvo que:

> In the volatile atmosphere of a prison, an
> inmate easily may constitute an
> unacceptable threat to the safety of the
> other prisoners and guards even if himself
> has committed no conduct; rumor,
> reputation, and even more imponderable
> factors may suffice to spark potentially
> disastrous incidents. The judgment of
> prison officials in this context, like
> that of those making parole decisions,
> turns largely on "purely subjective
> evaluations and on predictions of future
> behavior."

Es en virtud de esta gran discreción, que las autoridades correccionales deben gozar de gran deferencia por parte de los tribunales cuando la parte alegadamente afectada pretende revisar judicialmente sus actuaciones.[5]

---

[5] Cabe precisar que aun cuando las instituciones correccionales disponen de tal discreción, los tribunales no abdican su responsabilidad constitucional para delinear y proteger los derechos fundamentales. Así, en *Sandin v. R.D. Conner*, 515 U.S. 472 (1995), el Tribunal Supremo de los Estados Unidos, en ocasión de determinar si a un convicto le asiste un interés libertario bajo cierta reglamentación del sistema correccional de Hawai, expresó:

> [W]e recognize that States may under
> certain circumstances create liberty
> interests which are protected by the Due
> Process Clause. But these interests will
> be generally limited to freedom from
> restraint which, while not exceeding the

continúa...

Es norma reiterada que los tribunales le deben dar gran peso o deferencia a las aplicaciones e interpretaciones de las agencias con respecto a las leyes y reglamentos que administran por lo que no pueden descartar libremente sus conclusiones e interpretaciones de derecho. *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, 150 D.P.R. 70 (2000); *Rodríguez v. Méndez & Co.*, 147 D.P.R. 734 (1999); *Misión Ind. P.R. v. J.P.*, 146 D.P.R. 64 (1998); *Rivera Rentas v. A & C Development*, supra; *Com. Electoral P.I.P. v. C.E.E.*, 139 D.P.R. 48 (1995); *Rubín v. Trías*, 111 D.P.R. 481 (1982); *Román v. Superintendente*, 93 D.P.R. 685 (1966).  La interpretación administrativa no tiene que ser la única que razonablemente se pueda llegar del estatuto, siendo suficiente que la misma esté sostenida por evidencia sustancial, sea razonable y consistente con el propósito legislativo. *Rodríguez v. Méndez & Co.*, supra.  La razón principal detrás de la

---

... 5 continuación

sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. (Citas omitidas.) Vease además, *Meachum v. Fano*, 427 U.S. 215 (1976) y *Wolff v. McDonell*, 418 U.S. 539 (1974)

Es decir, en ausencia de circunstancias extraordinarias, en las cuales se someta al recluso a condiciones opresivas e inusitadas o se altere los términos de la sentencia, las instituciones carcelarias merecen deferencia en cuanto sus interpretaciones y conclusiones.

adopción de esta norma es la vasta experiencia y conocimiento (*expertise*) en relación con la materia que atienden día a día.

Conforme al marco jurídico antes expuesto, procede que resolvamos la presente controversia.

IV

Examinados los hechos del caso de autos vemos que, en 1987, el confinado fue condenado a cumplir cuatro (4) términos consecutivos de noventa y nueve (99) años de reclusión por los delitos de asesinato en primer grado, tentativa de asesinato y violación a los Artículos 5 y 8 (A) de la Ley de Armas de Puerto Rico, supra.

El T.A. expresó que la Administración no tomó en cuenta el desempeño y conducta del confinado en la institución carcelaria. Asimismo, determinó que la referida entidad no determinó nada referente al historial social y delictivo de éste, así como su comportamiento durante los 16 años que ha estado recluido en la institución. Según el foro apelativo intermedio, lo que tomó en cuenta el Comité de Clasificación para denegar la reclasificación, como único y dominante criterio, fue la sentencia impuesta al confinado. Finalmente concluyó que los fundamentos expresados por el Comité de Clasificación no cumplen con los criterios del Manual de Reglas 1979 ni con los índices o sistema de puntuación del Manual de Confinados. Ello, a su juicio, resultó ser una actuación

arbitraria por parte de la Administración de Corrección. Erró el T.A. al resolver de esta manera.

Ciertamente, si la Administración de Corrección hubiese tomado en consideración para reclasificar al confinado únicamente el largo de su sentencia, ello hubiese sido un claro abuso de discreción por parte de dicho cuerpo administrativo. Pero este no fue el caso. De un examen de las resoluciones emitidas tanto por el Comité de Clasificación como por el Director de Clasificación vemos que ambos cuerpos consideraron otros factores, los cuales motivaron que se denegara la reclasificación del confinado a un nivel de custodia mediana.

Primeramente, de una lectura de los Acuerdos del Comité de Clasificación y Tratamiento en relación con el caso del confinado recurrido (los cuales contaron con la unanimidad de los tres miembros), vemos que además de la sentencia impuesta se tomaron como base para denegar la reclasificación los siguientes factores: (1) que el confinado fue declarado delincuente habitual, (2) la gravedad de los delitos cometidos, (3) la proporcionalidad entre el tiempo cumplido y el largo de la sentencia impuesta, y (4) que al confinado le faltaban 8 años para resultar elegible para libertad bajo palabra. Como puede observarse, no sólo se tomó en cuenta la sentencia impuesta, sino otros criterios que los mismos reglamentos y manuales autorizaban a considerar.

Además de estos criterios, el Comité también consideró, conforme a la Regla 9 (C)(1) del Manual de Reglas de 1979, la información que tenía del confinado a su disposición.

Sobre este último asunto, es menester llamar la atención sobre el riesgo que representa la decisión alcanzada por el foro apelativo intermedio toda vez que no tomó en consideración las dos (2) reevaluaciones de clasificación de custodia previas que se le habían realizado al confinado. De una lectura de la evaluación que se le hiciera al confinado el 23 de enero de 2002, podemos observar que a éste le fue denegada la reclasificación de custodia porque no cumplió con el plan institucional asignado ya que se ausentaba del área escolar y porque tenía una querella pendiente por posesión de una jeringuilla. En dichos acuerdos, el Comité determinó que el confinado necesitaba de controles de seguridad extras.[6] Además, el 11 de julio de 2002 y el 2 de diciembre de 2002, el confinado finalizó el tratamiento de Trastornos Adictivos y la terapia de grupo para personas adictas, respectivamente.

La siguiente evaluación que se le hizo, en el año 2003, es la que el confinado cuestionó ante el tribunal apelativo.[7] La actuación del Comité resulta consistente

---

[6] *Véase* Apéndice del recurso, a las págs. 84-88.

[7] *Véase* "Acuerdos del Comité de Clasificación y Tratamiento" de 28 de abril de 2003, Apéndice del recurso, a las págs. 47-51.

con el interés prioritario del Estado en preservar la seguridad institucional y en proteger a la sociedad de aquellas personas que han violado las normas formales de comportamiento. Es decir, dicho Comité, que como mencionáramos anteriormente está compuesto por dos técnicos socio-penales y por un oficial correccional, entendió como medida protectiva que el confinado debía permanecer un tiempo más en vigilancia. De esta manera, podían constatar efectivamente si la rehabilitación del confinado fue efectiva. En estas circunstancias, no debemos intervenir con la determinación de la agencia de no reclasificar al confinado.[8]

De otra parte, como medida para exhortar al confinado, tanto el Comité como el Director resaltaron los legítimos esfuerzos del confinado para beneficiarse de los servicios que la institución ofrecía y le indicaron que en lo que se le volvía a evaluar, debería finalizar el Cuarto Año de Escuela Superior y continuar observando buenos ajustes. Tanto la buena conducta exhibida por el confinado, así como la participación de éste en distintos programas fueron factores considerados por ambos cuerpos administrativos al reevaluarlo. No obstante, al estudiar

_____

[8] Debemos llamar a la atención de lo que significa el hecho de que se transfiera al confinado a un nivel de custodia mediana. En ésta, el confinado estaría mayor tiempo fuera de su celda (a diferencia de la máxima en dónde puede estar fuera por sólo dos horas, y el resto del día en talleres y programas para su rehabilitación). Evidentemente, el confinado estaría compartiendo más tiempo con el resto de la población penal, lo que podría ser peligroso para él y para el resto de los confinados de no haberse rehabilitado completamente.

el contexto en el que se ha desenvuelto el presente caso, estos dos factores aunque importantes no fueron ser los únicos a considerarse para transferir al confinado a un nivel de custodia mediano.

Por todas estas razones, se revoca la sentencia del Tribunal de Apelaciones emitida el 17 de marzo de 2004 y se devuelve el caso a la Administración de Corrección.

Se dictará sentencia de conformidad.


                                        BALTASAR CORRADA DEL RÍO
                                             Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Jesús Cruz Negrón

    Recurrido

      v.                           CC-2004-359    Certiorari

Administración de Corrección

    Peticionaria

SENTENCIA

San Juan, Puerto Rico, a 28 de marzo de 2005.

Por los fundamentos antes expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se revoca la sentencia del Tribunal de Apelaciones emitida el 17 de marzo de 2004 y se devuelve el caso a la Administración de Corrección.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rebollo López disiente por entender que el presente caso se ha tornado académico, razón por la cual debe ser archivado. Dados los hechos particulares del mismo, no le aplica la excepción sobre el carácter recurrente o repetitivo de la controversia. El Juez Asociado señor Fuster Berlingeri disiente por entender que el caso se ha tornado académico. La Juez Asociada señora Fiol Matta concurre con el resultado sin opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo